MILTON FEIST and Others, Plaintiffs, *v.* THE FIFTH AVENUE BANK OF NEW YORK, as Trustee under an Agreement of Trust Dated October 4, 1924, between Leo Feist and The Fifth Avenue Bank of New York, and The Fifth Avenue Bank of New York, as One of the Executors of and Trustees under the Last Will and Testament of Leo Feist, Deceased, Defendants.

First Department, November 4, 1938.

*A. S. Gilbert* of counsel [*Gilbert & Gilbert*, attorneys], for the plaintiffs.

*Leon Schaefler*, for the defendant The Fifth Avenue Bank of New York, as trustee, etc.

GLENNON, J. We will recite from the submission only those facts which we deem to be essential for the purpose of indicating our reasons for reaching the conclusion that plaintiffs are entitled to have judgment rendered in their favor against the defendant.

On or about the 4th day of October, 1924, Leo Feist duly executed a trust agreement with The Fifth Avenue Bank of New York, as trustee, which thereupon entered upon its duties as trustee, and is still acting in that capacity. The plaintiff Milton Feist is the life beneficiary under the terms of the agreement. He is the son of Leo Feist. The plaintiffs Nathan and Leonard Feist are remainder-

men. They also are sons of the settlor. The plaintiff Marilyn B. Feist is a contingent remainderman. She is a granddaughter. Plaintiffs Bessie Feist and Abraham S. Gilbert and the defendant The Fifth Avenue Bank of New York are the executors and trustees under the last will and testament of Leo Feist. Bessie Feist and Abraham S. Gilbert, two of the executors, have joined with the plaintiffs but the defendant bank, because of its conflict of interests, has been made a party defendant in the action.

It is conceded that at the time the instrument was drawn and the trust created, the plaintiff Milton Feist was an invalid and has continued to be an invalid, "all of which has at all times been known to the defendant, The Fifth Avenue Bank of New York."

The income from the trust was to be used for the maintenance, medical attention, education and support of the beneficiary during his lifetime. Pursuant to the terms of the trust agreement, the trustee was authorized to invest the funds only in "bonds of the United States, State of New York, City of New York, or guaranteed mortgages on improved real estate in the City of New York." The submission is silent as to whether or not investments were made by the trustee in Federal, State or city bonds. However, on or about June 3, 1931, the defendant bank invested $60,000 in a first mortgage of $90,000 covering premises 319–323 East Forty-fifth street in the city of New York. Interest was paid on the mortgage to December 1, 1933. Interest due June 1, 1934, was not paid. "At that time a default occurred in the payment of such interest and no interest has since been paid on said mortgage."

On or about the 1st day of February, 1935, the defendant bank instituted an action to foreclose the mortgage. The owner failed to appear. At the sale the bank, in its individual capacity, bought the property in and still owns it. The result is that the trust fund in the sum of $60,000 is now invested in the property which the defendant owns.

It appears from the stipulation that in September, 1937, at the direction of the defendant, the buildings were demolished since the trustee felt that with the decline in rentals it would be imprudent to invest any additional sums in the property in order to comply with the provisions of the Multiple Dwelling Law as recently enacted.

The buildings, which were erected prior to 1902, were of the type known as cold water flats. The rents ranged from $20 to $25 a month for each apartment of six rooms. The net income of the three buildings from February, 1931, up to and including June, 1932, was at the rate of $1,400 per annum, after payment of taxes and other carrying charges, "but before allowing for the payment of interest on the $90,000 mortgage, which amounted to $5,400

per annum, making an annual deficit of $4,000." In other words, at the time the trust fund was invested in the mortgage the trustee knew that the buildings were being operated at a loss of $4,000 per year.

We do not consider that the investment was made prudently by the trustee either within the spirit and intent of the agreement or the norm which should govern where the property of beneficiaries of trust funds is involved. The purpose of the settlor was to provide an income for his invalid son. In fact the trust agreement dated October 4, 1924, states unequivocally: " It is the desire of Leo Feist, during his lifetime, to make suitable provision for the maintenance and comfort of his invalid son, Milton Feist." The settlor limited the investments to Federal, State and city bonds, or guaranteed mortgages on improved real estate. It is quite apparent that, in referring to " improved real estate," he had in mind buildings which could be classified as adequate and of the type which would earn income sufficient to net a return to cover not only taxes and other expenses but also payment of interest on the mortgage debt. The settlor was interested only in seeing that the object of his bounty should receive a sum, as income, from the investment which could be used for maintenance and support. Surely he did not intend to have the fund used in any manner which he deemed speculative.

While it is argued that the buildings located on the property constituted improvements within the meaning of the agreement, we do not believe that is so. One might just as well contend that dilapidated dwellings which had become uninhabitable, run down stables or garages and antiquated loft or factory buildings from which there was little or no return might come within the purview of improved real estate as used within the meaning of the trust indenture.

According to the submission the three buildings on the premises were not adequate improvements for the land. If that is true, and if the basic value of the property lay in its availability for high class improvements such as apartment houses, large stores and loft buildings, then, from a practical standpoint, the property upon which the loan was made was not " improved " within the meaning of the term as employed in the agreement.

Professor Bogert in his work entitled, " Trusts and Trustees " (Vol. 3, p. 2022), makes the following statement which is basically sound: " Loans on unproductive property should rarely be made. Normally the income from the mortgaged land should be sufficient to meet carrying charges, interest on the mortgage, and payments of installments of the principal as they come due, if the investment is to be reasonably prudent."

Before the loan was made one of the largest and best known real estate concerns valued the land at $135,000 and the three buildings at $15,000. It is asserted that the value of $150,000 was sufficient to justify a legal loan of $100,000, whereas, the loan made by the bank was only $90,000. Therefore, it is argued by the bank that the investment was a proper one. That argument would be sound if the bank in making the investment was using its own funds and not those of this particular beneficiary. This is not a case of hindsight being better than foresight. All the facts were known to the bank at the time it invested the funds in the mortgage under consideration. The result of the transaction has been that the plaintiff Milton Feist has been deprived of income to which he is justly entitled.

Pursuant to the terms of the stipulation, judgment is directed in favor of the plaintiffs and against the defendant, directing the latter to return to the trust created by Leo Feist under an agreement of trust dated October 4, 1924, the sum of $60,000 with interest at four per cent from June 3, 1931, and that The Fifth Avenue Bank of New York be permitted to credit against such amounts all sums paid by it to the life beneficiary in connection with said investment.

MARTIN, P. J., and TOWNLEY, J., concur; UNTERMYER and DORE, JJ., dissent and vote for judgment for the defendants.

DORE, J. (dissenting). In this action, submitted on an agreed statement of facts pursuant to sections 546–548 of the Civil Practice Act, plaintiffs seek to surcharge defendant as trustee for investing $60,000 in a participation in a guaranteed first mortgage of $90,000 covering premises 319–323 East Forty-fifth street, New York, N. Y. The purpose of the trust, as stated in the indenture itself, was to make suitable provision for the maintenance and comfort of the grantor's " invalid son, Milton Feist." Under its terms the trustee was authorized to invest in " bonds of the United States, State of New York, City of New York, or guaranteed mortgages on improved real estate in the City of New York."

The issues submitted for our determination are:

1. Was the property covered by the mortgage " improved " real estate as required by the trust agreement?

2. Was the investment a prudent one?

Plaintiffs contend, *first*, that the investment was wholly unauthorized because the property could not be considered " improved " real estate; and, *second*, that in any event the investment was imprudent.

Plaintiffs' argument on the first point is that, with the express purpose of the trust in mind to provide for the maintenance of an

invalid, the grantor directed investments only in the United States, New York State and New York city bonds and in guaranteed mortgages on improved real estate, that is, investments in a type of property that would secure income to maintain the invalid; that accordingly we should hold the word " improved " to mean adequately and permanently improved with buildings that would produce such annual income; and that the three old tenement houses on the property in question were clearly not adequate improvements, especially as they concededly showed at the time of investment a deficit in operation between $3,000 and $4,000 a year.

The premises consisted of a plot of ground seventy-five feet by one hundred feet, on which there were three old-law tenements of the type known as " cold water flats," having five floors and ten apartments in each building, or a total of thirty apartments in all. The apartments were occupied by poor people, rents ranging from twenty dollars to twenty-five dollars a month.

Plaintiffs, however, stipulated that the buildings in question were in fair-to-good shape for buildings of that type and age; that in one of them there was only one vacancy, in another three, and in another four, at the time the investment was made; that there were no violations, no unpaid taxes, water rates or meter charges, and that an appraisal made shortly before the investment by one of the largest and best real estate companies in New York valued the buildings at $15,000; that the net income was at the rate of $1,400 per annum after payment of taxes and all other carrying charges but before allowing for the payment of interest on the mortgage.

We consider that these stipulated facts are inconsistent with plaintiffs' claim that the property was not " improved." The word " improved " for the purpose of determining whether a surcharge should be made against a trustee is not to be given an unusual, narrow and restricted meaning, but must be taken in its ordinary usage according to the general understanding in the community. On the facts stipulated, it is clear the property was, according to such usage, improved. Plaintiffs fail to cite any decision in support of their contention that the word " improved " means what the plaintiffs here claim it to mean. They do cite a statute of the State of Washington but there is no such statute in the State of New York and in the absence of such restrictive statute the court must interpret the word in its usual and ordinary meaning. Otherwise we lay down a new doctrine not heretofore found in the statutes or precedents of this State, which would probably cast doubt on the legality of numerous trustees' and savings banks' investments hitherto considered valid. We, therefore, overrule plaintiffs' first contention.

Considering the investment as of the time it was made and not in the light of events occurring long subsequent thereto, we also hold that the investment was not an imprudent one so as to justify the onerous surcharge here claimed. One of the largest and best real estate companies in New York appraised the property at $150,000; $135,000, land; $15,000, buildings. In assigning a land value of $135,000, the appraiser considered the basic value of the property to lie in its availability for high class improvements such as apartment houses and large store and loft buildings which had been erected in the vicinity, as to which there are no facts in the record to show that at the time the investment was made such properties were not doing well. Among the facts considered were the facts that the premises were strategically located in the heart of New York city's business district in the vicinity of Grand Central Station, readily accessible to rapid transit lines; that the neighborhood was unrestricted; that the plot was large enough to carry a building of almost any height; that the neighborhood was one of the most active in the city from a real estate point of view; that the buildings were in fair-to-good condition for their type and age: that sales in the immediate neighborhood and investments by savings banks in property similar to the premises in question were then being made at a rate in excess of the rate found in the appraisal placed on these premises.

There were no tenement, building or fire violations on the premises at the time; no unpaid taxes, water rates or meter charges; the title was clear and unincumbered. All of these facts are stipulated, as well as the fact that, save where a trust agreement provided otherwise, land value was at the time of the mortgage investment a paramount factor in determining the desirability of a particular mortgage investment by many savings banks and fiduciaries in and about New York city.

There were substantial obligors on the bond. The Bryant Improvement Company, owner of the premises, had been organized in 1910, and was a long-established real estate firm. It had bought the property in 1928, and at the time the mortgage was placed owned eight other parcels of real estate in the immediate vicinity of the mortgaged premises. The obligors on the collateral bond were also responsible owners of numerous parcels of real estate and at the time of the investment, June, 1931, were reputed to be financially sound, and in September, 1920, were reputed to have a net worth of $1,000,000. The owner had an equity of about $45,000 in the property when the loan was made, having reduced the original principal of the mortgage from the time it purchased the property in 1928 by amortization payments aggregating $20,000. If the

owner had reduced the mortgage from $110,000 to $90,000, had met all carrying charges and interest payments on a greater amount since 1928, it would seem reasonable at the time to believe, particularly in view of the other facts stipulated herein, that the owner would continue to meet the carrying charges on the property and the interest payments on the $90,000 mortgage especially as no amortization was required. The relatively small deficit in the light of the investment made would hardly be deemed to affect owners who had invested so heavily in their equity in the premises in question and in numerous other properties in the neighborhood.

As required by the trust agreement, the mortgage was a guaranteed first mortgage, the guaranty made by the Union Guarantee and Mortgage Company. The trustee had investigated that company's financial condition and from the records in its files and its reputation among various financial institutions knew at the time that it was a well-managed, conservative and sound mortgage guaranty company. It is so stipulated.

While such guaranty, though required by this particular trust instrument, would not in and of itself excuse an investment otherwise improper, the trustee did not merely rely on the guaranty but made an independent investigation of its own at the time the investment was made. Although no operating statement was required of the owner, the trustee's investigator knew what the average rentals in the premises were, namely, between twenty dollars and twenty-five dollars a month for an apartment, and visited the premises shortly before the investment for the purpose of inspecting its condition. The investigator was well acquainted with the neighborhood and its real estate activity. He found the buildings in fair-to-good condition, the hallways and roofs in good repair; he knew the number of vacancies, and from his knowledge of this type of property and the average rents and the small upkeep, he was able to compute the gross rentals at approximately $8,000 per annum. This independent investigation, made almost immediately before the loan, was superior to any operating statement supplied by the owner.

The investment was made on June 3, 1931, and thereafter the premises were regularly inspected by a member of the trustee's real estate department. The first default in interest occurred June 1, 1933; the first default in taxes, April, 1933. In July, 1933, the trustee extended the mortgage for three years to the Highview Operating Corporation, the then record owner, on condition that it paid all interest, taxes and water rates then in default and agreed to improve the property by the expenditure of a substantial sum, and the interest was reduced from five and one-half per cent

to four and one-half per cent. The Highview Operating Corporation did pay up all interest and taxes and water rates in default and did make improvements. Thereafter there was default in taxes on November 1, 1933, and a default in interest on June 1, 1934. Following these defaults, the trustee foreclosed.

It is stipulated that the Multiple Dwelling Law " recently enacted *and enforced* [italics mine] made considerable changes in the requirements for old-law tenements; " and that the trustee felt it would be imprudent to invest additional sums in the property to comply with such law. In September, 1937, the buildings were demolished and the property is presently occupied as a parking lot, the rental for which pays the taxes, which are the only present carrying charges.

These facts sufficiently differentiate this case from *Matter of Dalsimer* (251 App. Div. 385). It is to be noted that our affirmance in that case was on the ground that on the facts disclosed the trustee was under a duty to make inquiry before making the investment and that no inquiry was had at the time the challenged investment was made. It was also shown that there were difficulties seriously affecting improved real estate in the immediate neighborhood of the premises there in question which were apparent and readily ascertainable; that there were unpaid water charges and an alarmingly large number of municipal violations of record; and that the conditions were such as to indicate the end of any reasonable hope that persons of sufficient financial ability would be found with the funds and the desire to redevelop the site. There is nothing in this record to show that at the time this investment was made there was any evidence whatever of a failing condition in the neighborhood of the property here in question. On the contrary, it is stipulated that the neighborhood was at the time one of the most active in the city from a real estate point of view. There was no default in taxes, interest or water charges and no violations whatever on the property.

While net income is an important factor, it is not the only factor to be considered in determining whether or not an investment is a prudent one. Otherwise no trustee could invest in one-family dwellings occupied by the owner, however great might be its value, however secure the responsibility of the owner, however excellent the past record of the property. The plaintiffs have cited no case in any appellate court of this State to substantiate their contention with regard to the absolute necessity of net annual income independent of all other factors. Independent research has failed to disclose such a case. There is no such rule of law. All factors must be considered.

In our opinion it is much more likely that the long-continued depression and the passage and vigorous enforcement of the fire retardment and sanitary amendments of the Multiple Dwelling Law, none of which facts the trustee could have reasonably been expected to have anticipated, were the real causes of the ultimate failure of this mortgage investment. Looking at the facts as they were in June, 1931, as set forth in the stipulation, we consider that then there was reasonable assurance for the security of the principal and also of the payment of the interest for the term that the mortgage was granted.

The prevailing opinion refers to the fact that in 1935 the owner failed to appear on the foreclosure sale and the bank bought in the property and still holds title to it. If so, it is held " for this trust " and other participants of the mortgage. But in our opinion these additional facts agreed to on request after the original submission are wholly immaterial to the issues litigated, viz., whether the trustee was prudent in 1931 when the investment was made, and the meaning of the word " improved " in the trust agreement. If the bank at any time in the future disposes of the property at a profit, any such profit will necessarily inure to the benefit of the trust (See *City Bank Farmers Trust Co.* v. *Evans*, 255 App. Div. 135, 138, 139; *Matter of Bussman*, 187 id. 574, 577; 1 Perry on Trusts [7th ed.], §§ 427, 428); but no such facts are now before us. The facts referred to as happening in 1935 have no bearing whatever on the issues presented; nor do plaintiffs make any claim whatever in relation thereto.

For the reasons stated, judgment should be directed for the defendant, without costs.

UNTERMYER, J., concurs.

Judgment directed in favor of the plaintiffs and against the defendant, directing the latter to return to the trust created by Leo Feist under an agreement of trust dated October 4, 1924, the sum of $60,000 with interest at four per cent from June 3, 1931, and that The Fifth Avenue Bank of New York be permitted to credit against such amounts all sums paid by it to the life beneficiary in connection with said investment. Settle order on notice.